# United States District Court

**CENTRAL** **DISTRICT OF** **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Any and all funds held in Ally Bank Account #2153056292

**APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT**

**CASE NUMBER:**  2:18-MJ-00724

**[UNDER SEAL]**

I, **LYNDON A. VERSOZA**, being duly sworn, depose and say:

I am a United States Postal Inspector with the United States Postal Inspection Service, and I have reason to believe that in the      **NORTHERN**      District of      **TEXAS**
there is now concealed a certain person or property, namely (describe the person or property to be seized)

Any and all funds held in Ally Bank Account #2153056292

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981(a)(1)(A) and (C)

**concerning a violations of Title  18  United States Code, Sections** 1951(a)(3)(A) and (b), 1956 and 1957.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

**Continued on the attached sheet and made a part hereof.**      X  Yes __  No

_____
**Signature of Affiant**

**Sworn to before me, and subscribed in my presence**

_____
**Date**

_____
**City and State**

**Hon. PATRICK J. WALSH, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

_____
**Signature of Judicial Officer**

**John Kucera:smb**

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state as follows:

### I.   <u>TRAINING AND EXPERIENCE</u>

1.   I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in Los Angeles, California, where I have served since June 2005.  Currently, I am responsible for investigating criminal violations of money laundering and structuring laws, such as when United States Postal Service ("USPS") Money Orders or the United States Mail are used as a means to launder or structure funds.  During my career as a Postal Inspector, I have participated in or investigated financial violations including money laundering, structuring, bank, wire and mail fraud, and identity theft.  In addition, I have received both formal and informal training from USPIS and other agencies regarding money laundering and financial crimes.  For approximately five years prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking.  In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking.

2.   Prior to my service as a Federal Postal Inspector, I

attended the University of Southern California in Los Angeles, where, in 2001, I received a bachelor's degree.  While in college, I was the website administrator for a non-profit media company in Los Angeles where, among other things, I learned about domain names, domain name servers, and remote hosting. Following college, from 2002 to 2005, I served as a law enforcement officer with the U.S. Immigration and Naturalization Service, which later became U.S. Customs and Border Protection. There, among other things, I worked on cases involving human smuggling and international sex trafficking.

3.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

II.   **SUMMARY AND PURPOSE OF AFFIDAVIT**

4.    This affidavit is made in support of applications for

warrants to seize all funds held in certain SUBJECT ACCOUNTS and certain SUBJECT DOMAINS, all owned or controlled by "Backpage.com" (referred to herein as "Backpage"), associated entities, and the owners and operators of each.

      A. <u>Background</u>

    5.    This case is being investigated by the USPIS, the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service-Criminal Investigation ("IRS-CI"), with assistance from the Los Angeles Joint Regional Intelligence Center.

    6.    The focus of the investigation has been on violations by Backpage, its associated entities, and the owners and operators of each of Title 18, United States Code, Sections 1952(a)(3)(A) and (b)(i)(1) (Interstate and Foreign Travel in Aid of Racketeering Enterprise); and Title 18 U.S.C. §§ 1956 and 1957, (Money Laundering).

    7.    From speaking with other agents in this investigation, and reviewing emails, internal documents, and other records related to this investigation, I know the following:

      a.    Backpage.com, LLC, incorporated in Delaware in 2004, is an internet-based company that allows customers to post on-line classified advertisements.  These advertisements include sections dedicated to a variety of matters, including adult, automotive, community, dating, jobs, local places, musicians, rentals and services.  Backpage receives between 75 million to

100 million unique internet visitors per month.

　　　b.　Backpage realizes profits in the tens of millions of dollars per year from adult advertisement.  Historically, adult ads, where Backpage advertisers post sex trafficking ads, constitute less than ten percent of all advertisements posted on the website.  However, the adult ads generate over 90 percent of Backpage's revenue.  In short, Backpage derives almost all its revenue and profits from adult service ads, including advertising for sex trafficking.[1]

　　　c.　In or about 2004, operators Michael Lacey ("Lacey"), James Larkin ("Larkin"), and Carl Ferrer ("Ferrer") created Backpage.  There were also two minority owners; John Brunst ("Brunst"), who owned 5.67 percent; and Scott Spear ("Spear"), who owned 4.09 percent.  From 2004 until 2015, Lacey and Larkin oversaw the website's policies and strategic

---

[1] According to Backpage accounting records, for the period May 1 to May 31, 2014, over 90% of Backpage's revenues derived from what they characterized as "adult entertainment."  Backpage's internal documents suggest that this 90% figure has been consistent since its 2004 inception.
For example, between October 6, 2014, and May 31, 2015, Backpage grossed almost $105 million from advertising "adult entertainment."  During this same period, Backpage grossed only $1.6 million from all other advertisements combined.  Assuming that Backpage has accurately estimated that 90% of its revenues are generated from "adult" and "escort" ads, Backpage has generated as much as $500 million in prostitution-related revenue since 2004.

direction.   In 2015, Lacy and Larkin purportedly sold all or substantially all of their interests in Backpage to Ferrer.[2] However Lacey and Larkin retained significant control over the website, and both Lacey and Larkin continue to receive tens of millions of dollars of annual distributions of Backpage revenue.

d.   While not an original owner, Ferrer was one of the original officers of Backpage, having initially served as Backpage's vice-president, and later as CEO.  Ferrer is also the CEO of several Backpage related entities in the Netherlands, including "Website Technologies," "Amstel River Holdings," and "Ad Tech BV."

e.   Michael Thomas Gage ("Gage") has no formal position at Backpage, but is the President, Chief Executive Officer, Treasurer, and Secretary of another Backpage controlled entity, "Posting Solutions," a wholly owned subsidiary of Backpage that receives payments from Backpage advertisers. According to his social media profile, Gage is also the Chief Financial Officer of Website Technologies.  Based on emails he has sent and wire transfer information, Gage appears to control

---

[2] From my review of financial records related to Ferrer's 2015 agreement to purchase Backpage, it appears that, through a series of loans from other Backpage Operators to be repaid by Ferrer, Ferrer agreed to purchase Backpage for approximately $400 million.

much of the international and domestic financial transactions of Backpage and its related entities.

      f.   Daniel Hyer ("Hyer") at one time was the Sales and Marketing Director of Backpage.  He remains an account signatory for Backpage controlled entities, including Website Technologies.

      8.   Throughout this affidavit, the individuals identified in paragraphs 7(c) through (f), along with others not named in this affidavit, are collectively referred to as the "Backpage Operators."

      9.   Based on a review of publicly available materials obtained in the course of the investigation, and my review of the Backpage website, I have learned the following:

      a.   The majority of the paid advertisements on the Backpage website relate to prostitution activities in violation of 18 U.S.C. §§ 1591 and 1252.

      b.   As further described below, Backpage itself, as well as its operators, who are in control of the SUBJECT ACCOUNTS and SUBJECT DOMAINS (as those terms are defined below), is in the business of promoting the trafficking of children and adults for sex.  Sex trafficking of adults is a violation of 18 U.S.C. § 1952, and sex trafficking of children is a violation of 18 U.S.C. 1591, each of which statutes is a Specified Unlawful activity ("SUA") within the meaning of federal law. (*see* 18

- 6 -

U.S.C. § 1956(c)(7)(vii)).

  c. The SUBJECT ACCOUNTS (all of which are located in the United States) have received wire transfers from places outside of the United States, which funds Backpage would then use to promote sex trafficking, in violation of 18 U.S.C. § 1956(a)(2)(A) (International Money Laundering).  Some of the SUBJECT ACCOUNTS have received transfers or deposits in excess of $10,000 traceable to the SUA, in violation of 18 U.S.C. § 1957 (Money Laundering Spending Statute).

  d. The SUBJECT DOMAINS are registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that manages the reservation of internet domain names for Backpage. A domain registrar serves to ensure that a registered domain name, like each of the SUBJECT DOMAINS, is not double sold. Additionally, a domain registration will allow the owner of the domain to direct internet traffic to a company's webserver.  The SUBJECT DOMAINS have been acquired and maintained with funds traceable to the money laundering scheme described herein, specifically with funds from SUBJECT ACCOUNT 1, and the SUBJECT DOMAINS are the mechanism Backpage uses to promote the prostitution and sex trafficking activity described below.

  10.  From my review of publically available materials and bank statements obtained in the course of this investigation, I have learned the following:

a.   Verizon Digital Media Services in Los Angeles,
California ("Verizon") provides various media solutions for
internet related activities, including web acceleration,
commerce acceleration, cloud security and video
streaming.  Based on my training and experience, I know that
these type of services would be necessary for a high-volume
website like Backpage to operate efficiently and handle internet
traffic without delay for the end user.

b.   Beginning when the account was opened in February
2017, and continuing until at least December 2017, SUBJECT
ACCOUNT 1 has directed $570,530 dollars to Verizon to pay for
Backpage related expenses.

B. <u>SUBJECT ACCOUNTS</u>

11.  This affidavit is offered in support of applications
for warrants to seize all funds held in the following U.S. bank
accounts (hereinafter referred to collectively as the "SUBJECT
ACCOUNTS"):

a.   SUBJECT ACCOUNT 1: Prosperity Bank account number
216887188, is a business bank account held in the name of
"Posting Solutions LLC."  Gage is identified in the records of
the account as the President, Chief Executive Officer,
Treasurer, and Secretary of Posting Solutions LLC, and is the
sole signatory on SUBJECT ACCOUNT 1.  As further described
below, SUBJECT ACCOUNT 1 is one of Backpage's main operating

accounts, used to receive funds from customers paying for Backpage advertising, including advertising to promote sex trafficking.

b.    SUBJECT ACCOUNT 2A: Compass Bank Account number 6738453873 is a business bank account held in the name of "Cereus Properties LLC."  Spear is the sole signatory on the account.

c.    SUBJECT ACCOUNT 2B: Compass Bank Account number 6745023825 is held in the name of Brunst.

d.    SUBJECT ACCOUNT 3A: National Bank of Arizona Account number 45000178 is a checking account held in the name of Spear.

e.    SUBJECT ACCOUNT 3B: National Bank of Arizona Account number 45000151 is a checking account held in the name of Spear.

f.    SUBJECT ACCOUNT 3C: National Bank of Arizona Account number 46003645 is a checking account held in the name of Spear.

g.    SUBJECT ACCOUNT 4: Live Oak Bank Account Number 75600050642523 is a checking account held in the name of Spear.

h.    SUBJECT ACCOUNT 5A: Ascensus Broker Dealer Services Account Number 367726943-01 is an account held in the name of Natasha Spear, Spear's adult daughter.

i.    SUBJECT ACCOUNT 5B: Ascensus Broker Dealer

- 9 -

Services account Number 549755280-01 is an account held in the name of Natasha Spear.

       j.    SUBJECT ACCOUNT 6: First Federal Savings & Loan of San Rafael account number 51103620 is an account held in the name of Lacey.

       k.    SUBJECT ACCOUNT 7A: Republic Bank of Arizona account number 11101889 is an account held in the name of Larkin.

       l.    SUBJECT ACCOUNT 7B: Republic Bank of Arizona account number 11402592 is an account held in the name of Larkin.

       m.    SUBJECT ACCOUNT 7C: Republic Bank of Arizona account number 11002912 is an account held in the name of Ferrer.

       n.    SUBJECT ACCOUNT 7D: Republic Bank of Arizona account number 11402500 is an account held in the name of Ferrer.

       o.    SUBJECT ACCOUNT 7E: Republic Bank of Arizona account number 11101938 is an account held in the name of Larkin.

       p.    SUBJECT ACCOUNT 8A: Bank of America Account number 0000483072278225 is a checking account held in the name of Troy Larkin, James Larkin's adult son.

       q.    SUBJECT ACCOUNT 8B: Bank of America Account

number 0000005091387054 is an account held in the name of Ramon Larkin, James Larkin's adult son.

r.    SUBJECT ACCOUNT 8C: Bank of America Account number 0000001294879342 is a checking account held in the name of Hyer.

s.    SUBJECT ACCOUNT 8D: Bank of America Account number 0000488039130071 is a Savings Account held in the name of Hyer.

t.    SUBJECT ACCOUNT 9: San Francisco Fire Credit Union Account Number 75600050642523 is held in the name of Lacey.

u.    SUBJECT ACCOUNT 10: Ally Bank Account Number 2153056292 is an account held in the name of Spear.

v.    SUBJECT ACCOUNT 11: Branch Banking and Trust Bank account number 1440001710218 is an account held in the name of Gage.

w.    SUBJECT ACCOUNT 12A: Green Bank Account number 3094832 is an account held in the name of Ferrer.

x.    SUBJECT ACCOUNT 12B: Green Bank Account number 5501194293 is an account held in the name of Ferrer.

y.    SUBJECT ACCOUNT 13: Plains Capital Bank account number 5501801098 is an Interest on Lawyers Trust Account ("IOLTA") held in the name of Phillip Linder, identifying April Ferrer (who is or was Carl Ferrer's spouse) as the sole

- 11 -

beneficiary.

      C.  <u>SUBJECT DOMAINS</u>

12.  This affidavit also supports an application for a warrant to seize the following domain names managed by "Ascio Technologies," incorporated in Delaware, the domain registrar for the SUBJECT DOMAINS, (hereinafter, collectively referred to as "SUBJECT DOMAINS"):

    a.    atlantabackpage.com

    b.    backpage.be

    c.    backpage.com

    d.    backpage.com.br

    e.    backpage.cz

    f.    backpage.dk

    g.    backpage.ee

    h.    backpage.es

    i.    backpage.fi

    j.    backpage.fr

    k.    backpage.gr

    l.    backpage.hu

    m.    backpage.ie

    n.    backpage.it

    o.    backpage.lt

    p.    backpage.mx

    q.    backpage.net

r.   backpage.no

s.   backpage.pl

t.   backpage.pt

u.   backpage.ro

v.   backpage.si

w.   backpage.sk

x.   backpage.us

y.   backpage-insider.com

z.   bestofbackpage.com

aa.  bestofbigcity.com

bb.  bigcity.com

cc.  chicagobackpage.com

dd.  denverbackpage.com

ee.  newyorkbackpage.com

ff.  phoenixbackpage.com

gg.  sandiegobackpage.com

hh.  seattlebackpage.com

ii.  tampabackpage.com

**III.  APPLICABLE LAW**

13.  There is probable cause to believe that the SUBJECT
ACCOUNTS and SUBJECT DOMAINS are subject to seizure and
forfeiture by the United States under the following provisions:

a.   18 U.S.C. § 981(a)(1)(A), because those SUBJECT
ACCOUNTS and SUBJECT DOMAINS are involved in, and traceable to,

one or more transactions or attempted transactions in violation
of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C.
§ 1956(a)(2) (International Money Laundering for Promotion), and
18 U.S.C. § 1957 (Financial Transactions Involving Illicit
Proceeds).  Pursuant to 18 U.S.C. § 981(a)(1)(A), any property
involved in a transaction, or attempted transaction, in
violation of 18 U.S.C. §§ 1956 or 1957, or any property
traceable to such property, is subject to forfeiture to the
United States; and

          b.    18 U.S.C. § 981(a)(1)(C), because those SUBJECT
ACCOUNTS and SUBJECT DOMAINS constitute and are derived from
proceeds traceable to one or more violations of 18 U.S.C. §
1956(h), 18 U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.

     14.  Title 18 U.S.C. § 1956 prohibits, among other things,
financial transactions involving the proceeds of SUAs --
committed or attempted (1) with the intent to promote further
predicate offenses; (2) with the intent to evade taxation; (3)
knowing the transaction is designed to conceal the source,
location, ownership or control of the proceeds; or (4) knowing
the transaction is designed to avoid anti-laundering financial
reporting requirements.  18 U.S.C. § 1956(h) prohibits two or
more parties agreeing to accomplish the unlawful purpose of
money laundering.

     15.  Title 18 U.S.C. § 1957 prohibits a party from

- 14 -

knowingly engaging in a monetary transaction in excess of $10,000 with property that is criminally derived from some SUA.

16.  Title 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion) makes it a crime to transport, transmit, or transfer, or attempt to transport, transmit, or transfer, monetary instruments or funds (including funds that are not criminal proceeds) from the United States to or through a place outside the United States, or to the United States from or through a place outside the United States, with the intent to promote some SUA, as that term is defined in 18 U.S.C. § 1956(c)(7).

17.  The "Travel Act," 18 U.S.C. § 1952(a), an SUA, prohibits, in part, the use of the mail or any facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, by any person who thereafter performs or attempts to perform an act to promote, manage, establish, carry on, or facilitate the promotion, management, establishment and carrying on of such unlawful activity.  "Unlawful Activity," as defined in 18 U.S.C. § 1952(b), includes prostitution offenses in violation of the laws of the state in which such acts are committed or in violation of the laws of the United States. Prostitution is illegal in the State of California.  (*See, e.g.*,

- 15 -

Cal. Penal Code § 647(b).)

18. Sex trafficking of juveniles or any person by means of force, fraud or coercion, is a violation of 18 U.S.C. § 1591, an SUA.

IV.    **DIGITAL CURRENCY/BITCOIN**

19. Digital currency (also known as crypto-currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a sovereign government). It exists entirely on the Internet and is not stored in any physical form. It is not issued by any government, bank, or company, but is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Digital currency is not illegal in the United States and may be used for legitimate financial transactions. However, it is often used to conduct illegal transactions, such as the sale of controlled substance, or as in this investigation, to purchase ads to promote prostitution.

20. Bitcoin is a type of digital currency accepted by Backpage. Bitcoin payments are recorded on a public ledger that is maintained by peer-to-peer verification, and is thus not maintained by a single administrator or entity. Individuals can acquire Bitcoins either by "mining" them or purchasing Bitcoins from other individuals. An individual can "mine" Bitcoins by

allowing his/her computing power to verify and record the Bitcoin payments into a public ledger. Individuals are rewarded for this by being given newly created Bitcoins. Bitcoins can be bought and sold in fractions.

21. Backpage also accepts other digital currencies, including Litecoin, Bitcoin Cash, and Ether. Sometimes called "alt-coins," because they are alternatives to Bitcoins, these digital currencies were created after Bitcoin to address perceived weaknesses or problems with Bitcoin technology. Based on my review of Backpage transactions, the majority of Backpage's digital currency transactions are in Bitcoin.

22. An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be done on any type of computer, including laptop computers and smart phones.

23. Digital currency is generally stored in digital "wallets," which essentially store the access codes that allows individuals to conduct digital currency transactions on the public ledger. To access digital currency on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to a bank account number, while the private key is like a password used to access an online account.

24. Even though the public addresses of those engaging in

Bitcoin transactions are recorded on the public ledger, the true
identities of the individuals or entities behind the public
addresses are not.  If, however, an individual or entity is
linked to a public address, it would be possible to determine
what transactions were conducted by that individual or entity.
For these reasons, digital currency transactions are described
as "pseudonymous," meaning they are partially anonymous.

**V. <u>STATEMENT OF PROBABLE CAUSE</u>**

A. <u>Buying a Backpage Ad</u>

25.  In February 2018, I visited Backpage.com and, posing
as an advertising purchaser, engaged in the regular process of
posting an ad in the Backpage "Dating" section, which is one of
the places on Backpage.com where prostitution ads are commonly
found.  Through this process, I learned the following:

a.  A person looking to post an advertisement on
Backpage (an "advertiser") must first create an account.  Once
an account is created, the advertiser clicks on a link called
"Post an ad," which will then toggle certain categories
regarding where the ad should be posted (*e.g.*, "Los Angeles,"
"Riverside," etc.) and under what category the ad should appear
(*e.g.*, "Dating," "Adult," etc.).  The advertiser also has the
option to post pictures and videos.  In the adult sections,
opting to post in more than one geographical area, or opting to
post more frequently occurring ads will increase the

advertisement price.  Currently, Backpage.com charges $5 per ad
posted in the adult sections.  In some of the non-adult and non-
dating sections I checked, there was no charge at all to post an
ad.

      b.   Once an advertiser selects the desired options,
he or she is required to enter a phone number, a link to a
social media page (such as Facebook), and an email address.  The
Backpage website claims to verify the advertiser's phone number
before he or she can continue on to actually purchasing an ad.

      c.   In order to pay for Backpage ads, an advertiser
must first buy "credits."  Backpage offers several ways for an
advertiser to acquire credits:

         i.   A Backpage advertiser may mail gift cards,
checks, and money orders to "Posting Solutions" at a P.O. Box in
Dallas, Texas (as further described below, this P.O. Box is
associated with Posting Solutions and SUBJECT ACCOUNT 1).[3]

         ii.    Backpage directly accepts credit card

---

[3] I have reviewed the cash purchase of USPS money orders
subsequently directed to this P.O. Box.  Between September 2014
and June 2016, several millions of dollars in money orders were
purchased in what appears to have been structured transactions
(*i.e.*, transactions carried out in a manner intended to avoid
certain reporting requirements that USPS maintains for money
order purchases greater than $3000).  Based on my review,
hundreds of these money orders include email addresses with
words consistent with prostitution, such as "sex" or "sexy."

payment through a third-party credit card payment processor.

       iii.     Backpage also accepts several types of digital currency (specifically, Backpage accepts Bitcoin, Bitcoin Cash, Litecoin, and Ethereum).  If the advertiser selects this option, Backpage provides a digital currency wallet address where the advertiser can send the electronic transfer of the digital currency.

       iv.     Backpage also accepts cash, but only through third party payment processors.  Based on information gathered during this investigation, I believe that once the third-party payment processor receives cash, it converts the cash into digital currency and then electronically transfers that digital currency to a Backpage digital currency wallet.

26.  Digital Currency is processed through the subject accounts in the following way:

       a.     When Backpage receives digital currency, it will aggregate the digital currency and then transfer it to a third-party exchanger like GoCoin.[4]

       b.     In exchange for the digital currency, the exchanger

---

[4] GoCoin is a digital currency exchanger that converts Bitcoin, Litecoin and another digital currency into fiat currency, like the U.S. Dollar or the Euro.  GoCoin is owned by Manx Broadcasting Corporation, based in the Isle of Man.  GoCoin has offices in Singapore and Santa Monica, California and appears to hold bank accounts in several countries outside the United States.

transfers U.S. dollars from its foreign bank accounts into
Backpage operating accounts, such as SUBJECT ACCOUNT 1.  The
exchanger, if it so elects, may then sell its Bitcoin on various
Bitcoin markets.

27.  I reviewed records obtained from GoCoin.  From this
review, I estimate that between 5 to 10 percent of the ads posted
on Backpage.com are ads within the Central District of California
(including Los Angeles and Orange Counties).  For example, between
January 10 and February 3, 2016, approximately 500,000 ads were
posted on Backpage.com and paid for with Bitcoin, for which
Backpage received over $3,840,000 in revenue.  Of these
approximately 500,000 ads, approximately 28,400 were posted only
in LosAngeles.Backpage.com, Ventura.Backpage.com,
SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and
SanGabrielValley.Backpage.com.  These specific ads generated
approximately $184,479 in revenue.

B. THE SUBJECT ACCOUNTS

1. SUBJECT ACCOUNT 1

i.  Domestic Payments Into SUBJECT ACCOUNT 1

28.  While Backpage accepts payments for ads from third-
parties, for the purpose of this affidavit, I will focus on
advertising payments made via the Posting Solutions' P.O. BOX
using cash, money orders, or digital currency.

29.  From my review of Posting Solutions' application for the

USPS Dallas, Texas P.O. BOX, I learned that it was registered to "Website Technologies, LLC/Backpage.com." Also listed on the P.O. BOX Application were the names of several Backpage Operators, including Ferrer.

30. I have reviewed bank records for SUBJECT ACCOUNT 1. Based on my review, I know the following:

a. On February 15, 2017, Posting Solutions LLC, located at 13601 Preston Rd., Ste. 801E, Dallas, Texas 75240, opened Prosperity Bank account number 216887188 (SUBJECT ACCOUNT 1, which lists Gage as the sole signatory on the account).

b. Gage is the President, Chief Executive Officer, Treasurer and Secretary of Posting Solutions LLC.

c. Between February 16 and November 24, 2017, approximately $24,000,000 in checks and money orders, most payable to "Posting Solutions," but some payable to "Backpage," were deposited into SUBJECT ACCOUNT 1.

d. Included in these deposits were more than 24,000 individual checks and money orders of less than $1,000 each, totaling almost $7.5 million.

e. One such deposit was a $25 USPS Money Order purchased on June 15, 2017, in Duarte, California, made payable to "Posting Solutions PO BOX 802426, Dallas, TX", and deposited into SUBJECT ACCOUNT 1 on June 20, 2017. This money order included writing on the money order listing a phone number and the words

- 22 -

"Dulce Latina."

f.   $20 USPS Money Order purchased in Sacramento, California, and deposited into SUBJECT ACCOUNT 1 on May 3, 2017, included writing listing a phone number and the words "love my lips."

g.   A $150 Wells Fargo Bank Money Order, purchased in Arizona, and made payable to "Posting Solutions," included and email and the words, "red hot stuff".

31.   From a search of Backpage ads, I found almost 800 advertisements listing the same phone number found in the $25 USPS Money Order described above in Paragraph 30(e), and over 1300 ads listing the same phone number found on the $25 USPS Money Order described in Paragraph 30(f).  A review of these ads revealed images consistent, in my training and experience, with ads for prostitution.  For example, one such ad posted in Backpage's Los Angeles dating section depicted images of a woman on a bed with her buttocks presented in a sexual manner; another included a picture of a woman's cleavage; others included pictures of women posing in sexual positions wearing lingerie and pictures of a woman bending over revealing her naked buttocks.  These ads included the same phone numbers listed in the money orders, and the ads directed customers to call these numbers to schedule a meeting.

32.   From an internet search of the email address listed on

the money order described in Paragraph 30(g), I found
advertisements on several female escort websites that directed
customers to contact an Arizona phone number ending in 2397.  I
then searched Backpage.com for this phone number and found
approximately 760 ads that included this same phone number.  My
review of these Backpage ads revealed images indicative of
prostitution.  For example, one such ad posted on Backpage.com's
"massage" section in Arizona included sexual images such as a
woman lying on a bed wearing lingerie and a woman laying naked on
her stomach.  One of the ads describes, "Pampering provider | Body
Rub Massage | Body Shampoo | Body Scrub | 4 hands | Walk ins or
appointment."  From my training and experience, I know that legal
massage advertisements do not typically depict sexual images.
This advertisement depicted sexual images and included terms like
"4 hands," which I know to be coded language describing a massage
given to a customer by two women.  Such advertisements are often
indicative of prostitution.

      ii.  Foreign Transfers Into SUBJECT ACCOUNT 1

    33.  Based on my knowledge of this investigation, having
spoken to law enforcement personnel, and my review of the
financial records, when an advertiser purchases an ad for
prostitution using digital currency, the payments to Backpage (and
certain subsequent expenditures) then proceed in the following
manner:

a.   A "poster" of a prostitution ad on backpage.com would pick a payment method, for example, through Bitcoin payments as previously described above.

b.   The poster would already have Bitcoin or Backpage would direct the poster to a third-party exchanger in order to buy Bitcoin.

c.   Backpage would then provide the poster with a wallet address to send the specific amount of Bitcoin.

d.   The poster would receive credit to then post ads on Backpage.

e.   In batches, generally valued in hundreds of thousands of dollars, Backpage would sell the Bitcoin to a third party exchanger, frequently "GoCoin," in order to convert the Bitcoin into U.S. or foreign currency, which GoCoin generally holds in foreign bank accounts.

f.   GoCoin would wire funds from these foreign accounts to either 1) Backpage controlled foreign accounts, or 2) Backpage controlled domestic operating accounts.

g.   Backpage operators would hold these receiving accounts in the names of entities controlled by Backpage, such as Ad Tech BV, Posting Solutions (SUBJECT ACCOUNT 1 is held in the name of Posting Solutions), Website Technologies, or Cereus Properties (SUBJECT ACCOUNT 2A is held in the name of Cereus Properties).

- 25 -

h.    These funds that originated from foreign transactions would be used to pay for services, like Verizon in Los Angeles, or would be transferred to Backpage Operators' accounts and accounts held in their family members' names.

34.    I have reviewed records of wire transfers from countries outside the United States deposited into the SUBJECT ACCOUNT 1. Just for the period of August 1 through September 1, 2017, SUBJECT ACCOUNT 1 received over $2.7 million in wire transfers from outside the United States.  For example:

a.    On or about August 16, 2017, a company called "Binary Trading SG PTE LTD" ("Binary Trading") wired $535,500 from an account in Singapore into SUBJECT ACCOUNT 1.  Based on my review of records related to this transaction, Binary Trading is a name used by GoCoin.[5]

b.    On or about August 17, 2017, Binary Trading wired another $528,500 from a Singapore account into SUBJECT ACCOUNT 1.

c.    On or about August 30, 2017, a company named "TRILIX PTE LTD," listing the same Singapore address as Binary Trading and GoCoin, in four wires ranging from $385,450 to $492,250, sent approximately $1,717,750 from a Singapore account into SUBJECT ACCOUNT 1.  Memo lines from these wires list "GC" or

---

[5]  Further, according to GoCoin's website, GoCoin maintains offices at the Singapore address listed on the $535,500 wire from "Binary Trading."

"GC FOR INTERNET SERVICES."  I understand "GC" to mean GoCoin.

       iii.  <u>SUBJECT ACCOUNT 1 Payments for Backpage Operations</u>

    35.  I have reviewed outgoing payments from SUBJECT ACCOUNT 1 and found that substantial percentages of these payments are for the operation of Backpage.com.  For example, between July and October, 2017, SUBJECT ACCOUNT 1 wired over $1.1 million to pay for the following:

       a.  Between July and October 2017, SUBJECT ACCOUNT 1 wired $570,530 to Verizon Digital Media Services in Los Angeles.

       b.  On August 4, 2017, SUBJECT ACCOUNT 1 wired $4,137 to "Netnames," also known as ASCIO, to pay for the registration renewal of all the SUBJECT DOMAINS, including Backpage.com.

       c.  In August 2017, SUBJECT ACCOUNT 1 sent numerous automated clearinghouse payments to "Netchex Tax Prep Clients" totaling over $437,000.  From a review of their website, I learned Netchex is a human resources company that provides payroll and other such services to Backpage.

       d.  Within a one-week period beginning on August 2, 2017, SUBJECT ACCOUNT 1 wired approximately $77,800 to S&W Payroll Services.  An online search of S&W Payroll indicated that S&W Payroll is owned by Netchex.  As stated above, Netchex is a human resource service, and S&W Payroll appears to be Netchex's payroll division.

       e.  On August 11, 2017, SUBJECT ACCOUNT 1 wired

$5,319.79 to the Telesign Corporation, located in Marina del Ray, California.  According to their website, Telesign is a communications platform that delivers security for websites.

    f.   On August 18, 2017, SUBJECT ACCOUNT 1 wired $1,497 and $6,984, respectively, to two separate data backup companies for Backpage's on-line data backup.

36.  Based on my review of bank records for SUBJECT ACCOUNT 1 throughout the existence of the account, these types of transactions and expenditures were typical.

    2.  SUBJECT ACCOUNT 2A

        i.  Transfers From SUBJECT ACCOUNT 1

37.  From my review of bank documents, I have learned that SUBJECT ACCOUNT 2A is a Compass Bank business bank account owned by "Cereus Properties LLC," identifying Spear as the sole signatory.  My review revealed that this account was funded with transfers from SUBJECT ACCOUNT 1.  On average, during each month of 2017, SUBJECT ACCOUNT 1 transferred several hundred thousand dollars into SUBJECT ACCOUNT 2A.  For example:

    a.   On July 25, 2017, SUBJECT ACCOUNT 1 sent two wire transfers totaling about $566,562.47 to SUBJECT ACCOUNT 2A.

    b.   On August 8, 2017, SUBJECT ACCOUNT 1 sent a wire totaling $62,198.51 to SUBJECT ACCOUNT 2A.

    c.   On August 31, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling $487,491.45 to SUBJECT ACCOUNT 2A.

d.   On September 15, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling $91,672.67 to SUBJECT ACCOUNT 2A.

e.   On October 2, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling $471,766 to SUBJECT ACCOUNT 2A.

ii.   Foreign Transfers into SUBJECT ACCOUNT 2A

38.   I have reviewed financial records from a foreign bank in the Netherlands (the "Foreign Account").  I have also reviewed emails related to this account.  From my review of these records, I learned the following:

a.   The Foreign Account was opened in March 2015 and is held in the name of Ad Tech BV, a Netherlands based company, and identifies Ferrer as the CEO and Gage as the CFO.

b.   From March 2015 through November 2017, Foreign Account A received millions of dollars from Binary Trading SG PTE, Limited, the same company GoCoin used to wire funds into SUBJECT ACCOUNT 1.  In an April 4, 2017, email to employees of the bank that maintains the Foreign Account, Gage explained,

> Binary Capital is our trading partner, they hold money in trust for Go Coin [sic].  Rather than incurring 3 sets of wire fees which make our transactions unprofitable, they act as our agent and disburse payments directly from our trust account to our merchant.

c.   During this same period, Foreign Account A wire transferred several million dollars into SUBJECT ACCOUNT 2A. For example, an April 25, 2017, an email from Gage to individuals at the bank holding the Foreign Account directed the

- 29 -

bank to wire "USD $2,337,048" to SUBJECT ACCOUNT 2A.
Thereafter, I reviewed a wire record and confirmed that on April
25, 2017, the Foreign Account wired $2,337,048 into SUBJECT
ACCOUNT 2A, as Gage directed in his email.  In reviewing the
records, I found the following additional wires sent to SUBJECT
ACCOUNT 2A:

> i.      In December 2016, the Foreign Account wired
approximately $1 million dollars to SUBJECT ACCOUNT 2A.

> ii.     On February 28, 2017, the Foreign Account
wired $2,324,390 into SUBJECT ACCOUNT 2A.

> iii.    On March 30, 2017, the Foreign Account A
wired $2,247,858 into SUBJECT ACCOUNT 2A.

> iv.     On May 31, 2017, the Foreign Account wired
$2,335,076 to SUBJECT ACCOUNT 2A.

> v.      On June 28, 2017, the Foreign Account A
wired $2,324,390 to SUBJECT ACCOUNT 2A.

> vi.     July 27, 2017, the Foreign Account A wired
$10,928 to SUBJECT ACCOUNT 2A.

> iii.    <u>SUBJECT ACCOUNT 2A Payments for Backpage Operations</u>

39.  I then reviewed SUBJECT ACCOUNT 2A records for
payments to promote Backpage operations.  From March through
December 2017, SUBJECT ACCOUNT 2A paid over $9,000 to "Cox
Communications," an internet services company that provides
voice-over-internet phone and cable services.  I believe that

- 30 -

Backpage uses Cox Communications to facilitate its internet presence and promote its sale of prostitution advertising.

### 3. SUBJECT ACCOUNT 2B

40.  I reviewed records SUBJECT ACCOUNT 2A and SUBJECT ACCOUNT 2B.  On February 2, 2018, SUBJECT ACCOUNT 2A wired transferred $135,956.59 into SUBJECT ACCOUNT 2B.  I am aware of no other funding sources for SUBJECT ACCOUNT 2B.

### 4. SUBJECT ACCOUNTS 3A, 3B, 3C

41.  I have reviewed records for SUBJECT ACCOUNT 3A as well as the following accounts:  Branch Banking & Trust account number 1440001712008, belonging to Website Technologies (as detailed above, a Backpage controlled entity), held in Arizona ("BBT Account"); Arizona Bank & Trust account number 9361116211 belonging to Cereus Properties, held in Arizona ("AZBT Account").  From this review, I learned the following:

a.   Between December 14, 2015, and September 1, 2016, a GoCoin account held in Slovakia wired over $35 million to the BBT Account in the United States.

b.   Between December 31, 2015, and October 28, 2016, the BBT Account wired $48 million to the AZBT Account.

c.   On January 15, 2016, the AZBT account wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.

- 31 -

   d.   Between March 1 and July 1, 2016, the AZBT Account wired $892,426 into SUBJECT ACCOUNT 3A.

   42.   According to records for SUBJECT ACCOUNTS 3A, 3B, and 3C:

   a.   On September 14, 2017, SUBJECT ACCOUNT 2A wired $50,162.05 into SUBJECT ACCOUNT 3A.

   b.   On October 12, 2017, SUBJECT ACCOUNT 3A wired approximately $21,500 into SUBJECT ACCOUNT 3B.

   c.   On January 5, 2018, SUBJECT ACCOUNT 3A wired approximately $600,000 into SUBJECT ACCOUNT 3C.



SUBJECT ACCOUNT 3A



SUBJECT ACCOUNT 3A through 3C and SUBJECT SAFE DEPOSIT BOX 1

5. SUBJECT ACCOUNT 4

43.  From my review of the records for SUBJECT ACCOUNT 4
(belonging to Spear), I learned that on or about March 16, 2016,
SUBJECT ACCOUNT 3A transferred $250,000 into SUBJECT ACCOUNT 4
as an opening deposit.  On March 20, 2018, Live Oak Bank
confirmed that these funds have remained in SUBJECT ACCOUNT 4
since the account was opened.

6. SUBJECT ACCOUNT 5A and 5B

44.  I have reviewed financial records related to SUBJECT
ACCOUNTS 5A and 5B, held in the name of Natasha Spear, Scott
Spear's adult daughter.  From this review, I learned the
following:

a.   On February 23, 2017, SUBJECT ACCOUNT 3A wired
approximately $50,000 into SUBJECT ACCOUNT 5A.

b.   On the February 23, 2017, SUBJECT ACCOUNT 3A
wired $50,000 into SUBJECT ACCOUNT 5B.

7. SUBJECT ACCOUNT 6

45.  From my review of financial records related to SUJBECT
ACCOUNTS 2A, 2B and 6, I learned the following:

a.   On October 2, 2017, SUBJECT ACCOUNT 2A wired
approximately $297,795 into SUBJECT ACCOUNT 6.



8. <u>SUBJECT ACCOUNTS 7A through 7E</u>

46.   From my review of financial records of SUBJECT ACCOUNTS 2A and 2B, 7A through 7D, and 12A, I learned the following:

a.   On July 6, 2017, SUBJECT ACCOUNT 2A wired $971,651.51 into SUBJECT ACCOUNT 7A.

b.   On July 28, 2017, SUBJECT ACCOUNT 7A wired $400,000 into SUBJECT ACCOUNT 7B.

47.   From my review of financial records of SUBJECT ACCOUNTS 1 and 7C, and those concerning the Veritex Bank account ending in -1462, held in the name of Posting Solutions ("Account -1462"),[6] I learned the following:

a.   On January 13, 2017 and January 20, 2017, a GoCoin account in Singapore wired a total of approximately $1,318,800 into Account -1462.

_____

[6] Veritex Bank is a U.S. bank located in Dallas, Texas.  Posting Solutions opened Veritex Bank account -1462 on or about January 5, 2017.

- 34 -

b.    In February 2017, Account -1462 wired a total of $5,395 to Verizon, in Los Angeles.

c.    On August 8, 2017, SUBJECT ACCOUNT 1 wired $62,000 into SUBJECT ACCOUNT 12A.

d.    On November 3, 2017, SUBJECT ACCOUNT 12A wired $100,000 to SUBJECT ACCOUNT 7D.

9. SUBJECT ACCOUNTS 8A, 8B, 8C, and 8D

48.  From my review of the records for SUBJECT ACCOUNTS 2A and 2B, 8A, and 8B, I learned the following:

a.    On February 2, 2018, SUBJECT ACCOUNT 2A wired $28,337 into SUBJECT ACCOUNT 8A.

b.    Also on February 2, 2018, SUBJECT ACCOUNT 2A wired $28,337 into SUBJECT ACCOUNT 8B.

49.  From my review of SUBJECT ACCOUNTS 1, 8C, and 8D, I learned the following:

a.    On August 2 and August 8, 2017, SUBJECT ACCOUNT 1 wired $33,700 and $44,000, respectively, to S&W Payroll, a company Backpage uses to pay its employees.

b.    Between August 11, 2017, and December 1, 2017, S&W Payroll wired a total of $207,125.81 into SUBJECT ACCOUNT 8C.

c.    Between November 3, 2017, and December 8, 2017, SUBJECT ACCOUNT 8C wired $57,500 into SUBJECT ACCOUNT 8D.

10.     SUBJECT ACCOUNT 9

50.   From my review of the records for SUBJECT ACCOUNTS 2A 2B, and 9, I learned that on February 2, 2018, SUBJECT ACCOUNT 2A wired $734,603.70 into SUBJECT ACCOUNT 9.

11.     SUBJECT ACCOUNT 10

51.   From my review of records for SUBJECT ACCOUNTS 2A and 10, I learned that on February 2, 2018, SUBJECT ACCOUNT 2A wired $94,154.89 into SUBJECT ACCOUNT 10.

12.     SUBJECT ACCOUNT 11

52.   From my review of SUBJECT ACCOUNTS 1, 8C, 8D, and 11, as well as Account -1462 (as described above, a Posting Solutions' Veritex Bank account), I learned the following:

a.   On January 4, 2017, GoCoin's Singapore account wired $489,500 into Account -1462, and on January 20, 2017, GoCoin's Singapore account directed two additional wires, for $358,150 and $470,150, respectively, into Account -1462 (for a total of $1,317,800 wired from GoCoin's Singapore account into Account -1462).

b.   On January 24, 2017, Account -1462 wired approximately $1.3 million into S&W Payroll.

53.   On January 27, 2017, an S&W Payroll account wired a total of $9,913.53 into SUBJECT ACCOUNT 11.

13.     SUBJECT ACCOUNTS 12A and 12B

54.  From my review of financial records for SUBJECT ACCOUNTS 1, 12A, and 12B, I learned the following:

        a.   On August 8, 2017, SUBJECT ACCOUNT 1 wired $62,000 into SUBJECT ACCOUNT 12A.

55.  On December 8, 2017, SUBJECT ACCOUNT 12A wired $20,000 into SUBJECT ACCOUNT 12B.

14.     SUBJECT ACCOUNT 13

56.  From my review of financial records for SUBJECT ACCOUNTS 1, 12A, and 13, I learned the following:

        a.   In January 2017, SUBJECT ACCOUNT 1 wired $62,000 into SUBJECT ACCOUNT 12A.

        b.   On August 16, 2017, SUBJECT ACCOUNT 12A wired $20,000 into SUBJECT ACCOUNT 13.

15.     SUBJECT DOMAINS

57.  From my review of records from Ascio Technologies ("ASCIO"), the domain registrar for the SUBJECT DOMAINS, I learned the following:

        a.   ASCIO is a domain registrar that manages the reservation of internet domain names for Backpage, and ASCIO is the registrar for over 300 domain names registered by Ferrer and Backpage.com, LLC.

        b.   On or about August 4, 2017, SUBJECT ACCOUNT 1 wired $4,147 to ASCIO/WMB Inc. as payment for the renewal of the

SUBJECT DOMAINS.  From my training and experience and review of online sources, I know that, in general, to reach a website on the Internet, a person types an address into a web browser or computer.  That address is usually in the form of a name or a number and has to be unique so computers can locate the website.  The Internet Corporation for Assigned Names and Numbers or "ICANN," coordinates these unique identifiers across the world with registrars.  Domain renewal fees are paid annually and are in part used to maintain this service.  This allows visitors to be pointed to Backpage controlled servers when they point their web browser to addresses such as www.backpage.com.

c.   In order to maintain an on-line presence, companies like Backpage must renew their domains yearly, generally for a fee.  Without this payment, the domain could be resold to others and Backpage customers would not be able to find the Backpage servers when the customer types the domain name in their web browser.

58.  Of the over 300 domain names registered by Backpage.com LLC and/or Ferrer, all of which I reviewed, I believe the 35 SUBJECT DOMAINS are specifically used to promote and advertise prostitution for the following reasons:

a.   I visited each of the SUBJECT DOMAINS and found that, with the exception of "Backpage-insider.com", the SUBJECT

DOMAINS that begin with the word "Backpage" automatically redirected my internet browser to Backpage.com.  These particular SUBJECT DOMAINS act and appear exactly as Backpage.com.

    b.   I visited Backpage.com and navigated to the Los Angeles/Dating/Women for Men section.  I clicked on the first ad listed (Post ID 142685832).  This ad contained approximately one dozen pictures of women posing sexually, many on a bed wearing lingerie.  Super-imposed over a few of the images was the text: "JENNY HERE TODAY – FBSM – BETTER THAN NURU."  An open source search for "FBSM" indicated that FBSM is code language for "Full Body Massage."  An open source search for "NURU" produced the following description:

> NURU is a Japanese erotic massage technique in which one or more masseuses would rub their body against the client's body after both parties are nude.

    c.   Based on this review, I believe this to be an advertisement in promotion of prostitution.  From my further review, I observed thousands of other ads that posted similar content consistent with advertising prostitution.

59.  I also attempted to visit Backpage-Insider.com, bestofbackpage.com, bestofbigcity.com, but these domains did not have a landing page and were unavailable.

60.  On March 22, 2018, I visited bigcity.com and, similar to Backpage.com, I found sexual content and additional

advertisements promoting prostitution.  On the initial landing page for bigcity.com, there was a disclaimer noting that the website included sexual content.

61.  I also attempted to visit chicagobackpage.com, denverbackpage.com, newyorkbackpage.com, phoenixbackpage.com, sandiegobackpage.com, seattlebackpage.com, and tampabackpage.com.  Each of these domains automatically directed me to a landing page with links to other websites with sexual content, including Backpage.com.

62.  Based on the above, there is probable cause to believe that funds wire transferred into the SUBJECT ACCOUNTS have been used to support and maintain each of the SUBJECT DOMAINS that promote prostitution.  Therefore, each of the SUBJECT DOMAINS is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because those SUBJECT DOMAINS are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(h) (International Money Laundering for Promotion and Money Laundering Conspiracy, respectively), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds).

## VI.    CONCLUSION

63.  For the reasons stated above, there is probable cause to believe that the SUBJECT ACCOUNTS and SUBJECT DOMAINS are subject to seizure and forfeiture by the United States under the

following provisions:

       a.  18 U.S.C. § 981(a)(1)(A), because each of the SUBJECT ACCOUNTS and SUBJECT DOMAINS are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds); and

       b.  18 U.S.C. § 981(a)(1)(C), because those SUBJECT ACCOUNTS and SUBJECT DOMAINS constitute and are derived from proceeds traceable to one or more violations of 18 U.S.C. § 1956(h), 18 U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.


_____
Lyndon Versoza
U.S. Postal Inspector


Subscribed to and sworn to me
this 26th day of March, 2018

_____
United States Magistrate Judge